FILED

2023 Sep-27  AM 11:34
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

|  |  |  |
|---|---|---|
| **TUSCALOOSA HYUNDAI, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **7:21-cv-00571-LSC** |
| | ) | |
| **HYUNDAI MOTOR AMERICA, INC. and GENESIS MOTOR AMERICA, LLC,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OF OPINION

Plaintiff Tuscaloosa Hyundai, Inc. ("Plaintiff") brings this action under the Alabama Motor Vehicle Franchise Act ("AMVFA"), Alabama Code § 8-20-1, *et seq*., against Hyundai Motor America, Inc. ("HMA") and Genesis Motor America, LLC ("GMA") (collectively, "Defendants"). Before the Court is Defendants' Motion for Summary Judgment. (Doc. 25.) For the reasons stated below, this motion is due to be **GRANTED** in part and **DENIED** in part.

## I.   BACKGROUND[1]

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). The Court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits specifically

Plaintiff owns and operates a car dealership in Tuscaloosa, AL from which it sells Hyundai and Genesis brand vehicles. (Doc. 22 ¶ 1.) HMA and GMA are the U.S. distributors of Hyundai and Genesis brand vehicles, respectively. (*Id.* ¶ 2.) Plaintiff has sold Hyundai vehicles since 2008, when it entered into a Hyundai Dealer Sales and Service Agreement ("DSSA") with HMA. That DSSA has been amended over the years. (*Id.* ¶ 3.)

In 2014, Plaintiff proposed to relocate its dealership to a new location in Tuscaloosa. (*Id.* ¶ 5.) Plaintiff prepared and designed the new facility in consultation with, and with the approval of, HMA. (Doc. 30 ¶ 1.) HMA loaned Plaintiff $1 million to support the relocation; the total cost of the new facility exceeded $10 million. (Docs. 22 ¶ 6; 30 ¶ 10.) In 2015, HMA announced a plan to launch Genesis as a new luxury brand. (Doc. 30 ¶ 2.) About one-third to one-half of the way through construction of the new facility, HMA asked plaintiff to modify its plans to incorporate a premium Genesis area called a Showroom within a Showroom. (*Id.* ¶¶ 4, 8, 9.) Plaintiff agreed and "built the facility to meet and exceed all HMA and GMA requirements, according to HMA and GMA direction." (*Id.* ¶ 36.) Before construction was completed, HMA photographed the store and showed it off at a

---

cited by the parties. *See Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record….").

national dealer meeting as a showpiece combined Hyundai and Genesis dealership. (Doc. 27-4 at 203:16–204:10.) Plaintiff began operating out of its new facility in 2016. (Doc. 30 ¶ 10.)

In March 2016, HMA and Plaintiff executed a Genesis Participation Agreement, which allowed Plaintiff to sell certain Genesis vehicles. (*Id.* ¶ 5.) At that time, Genesis was part of Hyundai. (Doc. 26 ¶ 9.) In 2018, HMA announced that Genesis would become a new line-make separate from Hyundai. (*Id.* ¶ 13.) GMA announced that it was seeking to have an initial network of fewer than 100 Genesis dealers, none of which were to be in Alabama. (Doc. 30 ¶¶ 13, 16.) All existing Genesis dealers who were not appointed as dealers by GMA were to be terminated, including Plaintiff. (*Id.* ¶¶ 13, 16.)

Defendants faced significant backlash from this plan. The Texas DMV determined that the plan violated Texas law; GMA lost its license to distribute Genesis vehicles in Louisiana; and Florida denied GMA's application for a license to distribute Genesis vehicles in Florida. (*Id.* ¶ 18.) By May 2018, GMA relented and allowed all dealers who were previously selling Genesis vehicles to enter into a new Genesis DSSA. (*Id.* ¶ 21.) Plaintiff executed a DSSA with GMA in September 2018. (Doc. 26 ¶ 16.)

In January 2020, HMA and GMA introduced new voluntary incentive programs known as Accelerate and Keystone, which replaced prior programs. (Docs.

26 ¶¶ 17, 22; 30 ¶ 32.) The new programs were designed to encourage dealers to invest in the Hyundai and Genesis brands to improve customer experience, facilities, brand image, sales performance, and profitability. (Doc. 26 ¶¶ 18, 23.) Both are umbrella programs with numerous components. (*Id.* ¶¶ 19, 24.) Under Accelerate, dealers could earn various incentives worth up to 12% of MSRP for eligible Hyundai vehicles sold; under Keystone, dealers could earn up to 17.3% of MSRP for eligible Genesis vehicles sold. (*Id.* ¶¶ 17, 22.) In 2022, HMA launched a third incentive program called the Brand Ambassador program, offering up to $400 per qualifying vehicle wholesaled. (*Id.* ¶¶ 30, 32, 33.) Notably, all three programs offered certain incentive monies only to dealers that established or maintained exclusive facilities. Because Plaintiff's dealership is a combined Hyundai and Genesis facility, it did not and does not qualify for any incentives tied to exclusivity. (*See* doc. 22 ¶¶ 15, 21, 25.)

Both Accelerate and Keystone contain a provision under which Defendants may grant exceptions to the exclusive facility policies if appropriate to account for special circumstances. (Doc. 30 ¶ 35.) In October 2020, Plaintiff sent a letter to GMA requesting an exception to the exclusivity requirements of Accelerate and Keystone based on the recent construction of its new facility. (*See id.*) The following month, HMA and GMA regional personnel prepared and submitted a variance request on Plaintiff's behalf. (*Id.* ¶ 36.) The variance request noted Plaintiff's substantial

investments in a "state of the art" facility that was built to "meet and exceed all HMA and GMA requirements, according to HMA and GMA direction." (*Id.*) In March 2021, Defendants sent Plaintiff a letter denying the request and explaining that "they consider exclusivity an essential element of each facility program and that they were not willing to waive compliance with that condition for either Accelerate or Keystone." (Doc. 26 ¶ 49.)

When HMA and GMA launched Accelerate and Keystone, they also issued new Facility Usage Policies. (Doc. 30 ¶¶ 22, 27.) The Facility Usage Policies are incorporated into Plaintiff's DSSAs with HMA and GMA. (42 ¶¶ 7, 14.) Under those policies, Plaintiff is required to maintain separate sales facilities for Hyundai and Genesis vehicles. (*See* doc. 30 ¶¶ 23, 25, 28, 29.) The parties agree that, although Plaintiff is technically in violation of the new Facility Usage Policies, those policies cannot be enforced against it. (*See Id.* ¶¶ 30, 31.) Defendants have never threatened to terminate their DSSAs with Plaintiff or to penalize it for not having exclusive facilities. (Doc. 26 ¶ 51.)

## II.  STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Hickson*

*Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge should not weigh the evidence, but should determine whether there are any genuine issues of fact that should be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "view[ing] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213-14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (*per curiam*) (quoting *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004)). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element

of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013). Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## III.   DISCUSSION

Plaintiff alleges several violations of the Alabama Motor Vehicle Franchise Act (Counts 1–12) and one common-law claim of civil conspiracy (Count 13). Counts 1–4, 9, and 10 allege that Defendants unlawfully coerced or attempted to coerce Plaintiff to make substantial alterations to its facility or to establish or maintain exclusive sales facilities. (Doc. 22 at 14, 16, 18, 20.) Counts 5, 6, and 11 allege that Defendants unlawfully engaged in actions against Plaintiff that were arbitrary, unconscionable, unreasonable, or not in good faith. (Doc. 22 at 22, 25.) Counts 7, 8, and 12 allege that Defendants unlawfully sold or offered to sell new vehicles to other dealers at a lower actual price than offered to Plaintiff. (Doc. 22 at 30, 31.) Count 13 alleges that GMA unlawfully conspired with HMA in its multiple violations of the AMVFA. (Doc. 22 at 32.) All thirteen Counts relate to incentive programs offered by Defendants. (Doc. 22 at 1.)

Defendants move for summary judgment against all asserted claims. (Doc. 25.) Defendants claim that they did not coerce or attempt to coerce Plaintiff to make substantial alterations to its facility or to establish or maintain exclusive sales facilities; that their actions were motivated by legitimate business interests; that they offered the same price to all dealers; and that they cannot conspire under Alabama law. (Doc. 26 at 6–7.) Defendants also contend that Plaintiff cannot recover punitive damages on its claims under the AMVFA. (Doc. 26 at 31.)

**A. There is no coercion (Counts 1–4, 9, and 10).**

Alabama Code § 8-20-4(1)(f) makes it unlawful for any motor vehicle distributor "to coerce or attempt to coerce any motor vehicle dealer to … make any substantial alterations to the dealership premises when to do so would be unreasonable." *Id.* Section 8-20-4(1)(g) makes it unlawful for any motor vehicle distributor "to coerce or attempt to coerce any motor vehicle dealer to … establish or maintain exclusive sales facilities … unless such exclusive sales facilities … are reasonable and are otherwise justified by reasonable business considerations." *Id.* It is undisputed that Plaintiff is a motor vehicle dealer and Defendants are distributors under the AMVFA. (Doc. 22 ¶¶ 1, 2.) The threshold issue, therefore, is whether Defendants coerced or attempted to coerce Plaintiff to establish exclusive facilities.[2]

---

[2]    Plaintiff's allegations frame the exclusive facilities that Defendants' programs incentivize dealers to build as both "substantial alterations" under § 8-20-4(1)(f) and "exclusive sales facilities" under § 8-20-4(1)(g). (*See* doc. 22 at 15, 17, 19, 21.)

The AMVFA defines coerce to mean "[t]he failure to act in good faith in performing or complying with any term or provision of the franchise or dealer agreement, except that recommendation, persuasion, urging, or argument shall not be deemed to constitute a lack of good faith." Ala. Code § 8-20-3(1). Good faith is defined to mean "[h]onesty in fact and the observation of reasonable commercial standards of fair dealing in the trade." *Id.* § 8-20-3(8). Accordingly, to survive summary judgment, Plaintiff must establish a genuine dispute that Defendants were dishonest in fact or failed to observe reasonable commercial standards of fair dealing in the trade.

Defendants argue that their use of voluntary incentive programs to persuade Plaintiff to establish exclusive facilities is not coercive as a matter of law because the AMVFA excepts persuasion and urging from its definition of coercion. Plaintiff counters by claiming that Defendants' dishonesty in concealing their motivation for implementing the incentive programs—i.e., "to force [Plaintiff] to choose between the economic death of its business, or the termination of its Genesis franchise"—is sufficient dishonesty to constitute coercion under the AMVFA. (Doc. 30 at 23.) Plaintiff does not claim that Defendants concealed or misrepresented the terms of the incentive programs.

Plaintiff's position suffers from several fatal flaws. Foremost is Plaintiff's admission that GMA has "been open in its continuing desire to reduce its dealer

network to 100 dealers," which contradicts Plaintiff's claim that Defendants concealed their motivation for implementing the incentive programs. (Doc. 30 at 26.) Moreover, even assuming Defendants had unstated motives for implementing the incentive programs, Plaintiff cites no authority supporting its contention that having unstated motives amounts to dishonesty in fact. Defendants, however, cite courts addressing similar claims and finding ulterior motives irrelevant or insufficient to establish bad faith in the context of vehicle dealer franchise agreements. *See, e.g.*, *Cabriolet Porsche Audi, Inc. v. Am. Honda Motor Co.*, 773 F.2d 1193, 1208–09 (11th Cir. 1985) (finding "nothing unreasonable, unfair or coercive" about defendant's exclusive facility incentives despite evidence that it had "decided internally that it did not want dual dealers … and embarked on a course of conduct designed to force dealers to become exclusive or sell out"); *Chic Miller's Chevrolet, Inc. v. Gen. Motors Corp.*, 352 F. Supp. 2d 251, 260 (D. Conn. 2005) ("[A] long term plan that called for reducing the number of dealerships in a possibly oversaturated market is not alone evidence of bad faith.").

Plaintiff's theory is also premised on a false dilemma: the undisputed facts establish that Plaintiff faces neither the economic death of its business nor the termination of its Genesis franchise. Although Plaintiff styles the exclusive facility incentive payments—which it claims no contractual right to receive—as "crushing economic sanctions" designed to "mak[e] it so unprofitable for [Plaintiff] to operate

its Genesis dealership that it simply throws in the towel," the undisputed evidence establishes that Plaintiff has earned record profits that have increased significantly since the implementation of the programs. (Docs. 30 at 40; 27-4 at 220:4–221:3; 30-24 ¶ 226.) The parties also agree that Defendants cannot terminate Plaintiff's franchise without cause (doc. 30 at 28), and that "Defendants have never threatened Tuscaloosa Hyundai with franchise termination for refusing to comply with their exclusivity programs, nor have they made any other demand accompanied by a threat." (Doc. 26 ¶ 51.)

Despite these concessions, Plaintiff maintains that the incentive programs are coercive enforcement mechanisms for illegal facility usage policies that— independent of the incentive programs—purport to require exclusivity. (Doc. 30 at 23–28.) Ignoring that Plaintiff does not challenge the facility usage policies directly and that the parties agree these policies are unenforceable, Plaintiff's enforcement-mechanism argument fails for another reason. The Court is not persuaded that a voluntary incentive program becomes coercive merely because it incentivizes the same conduct that a separate policy purports to require.

Finally, Plaintiff posits that the incentive programs are coercive because they replaced prior incentive programs under which Plaintiff previously earned monies. (*See* doc. 30 at 25.) But Plaintiff does not claim that it had any right to receive such monies or that Defendants were without right to end those programs at their

discretion. *See Empire Volkswagen, Inc. v. World–Wide Volkswagen Corp.*, 814 F.2d 90, 96–97 (2d Cir. 1987) (collecting cases holding that exercising a contractual right does not constitute coercion). Plaintiff argues only that it "relied on [the prior dealer incentives] to be profitable." (Doc. 30 at 25.) Even if that argument could sustain a § 8-20-4(1) claim, it lacks record support. At best, the evidence shows that the incentive monies that Plaintiff previously received "improved gross profit." (Docs. 30 ¶ 34; 27-4 at 142:12–13.) It goes without saying that additional monies improve profits. Whether the monies were necessary for Plaintiff to achieve profitability is another issue. The record shows they were not.[3] (Docs. 30 at 40; 27-4 at 220:4–221:3; 30-24 ¶ 226.)

Defendants' arguments rest on firmer ground. It is undisputed that the incentive programs "are voluntary, and dealers are not required to participate in any aspect of the programs in order to comply with the requirements of a DSSA." (Doc. 22 at 7.) Plaintiff plainly concedes that "[t]he programs are an attempt by Defendants to persuade dealers to build qualifying facilities." (Docs. 26 ¶ 43; 27-4 at 189:5–17.) Persuasion is not coercion under the AMVFA. Ala. Code § 8-20-3(1).

Moreover, Defendants present unrebutted evidence that facility incentives such as those at issue here are commonplace in the industry (doc. 26 ¶ 35), and that

---

[3]   The Court further notes that each exclusive facility incentive that Plaintiff challenges is but one component of a voluntary program offering multiple incentives, many of which Plaintiff qualifies for and receives. (Doc. 26 ¶¶ 17, 19, 22, 24, 25, 31, 41, 47.)

distributors commonly "modify, adjust, clarify, expand, or reduce their incentive programs." (Doc. 30-2 at 41:7–42:8.) Defendants also offer several business rationales motivating their decision to incentivize exclusive facilities (doc. 26 at 15–16), none of which Plaintiff disputes. (*See* doc. 30 at 28.) These facts indicate that Defendants observed reasonable commercial standards of fair dealing in the trade.

In support of its position, Defendants cite cases addressing similar issues and concluding that the distributors' actions were not coercive.[4] For example, the court in *Long-Lewis Sterling W. Star of Bessemer v. Sterling Truck Corp.* analyzed alleged violations of the AMVFA. No. 2:09-cv-233-AKK, 2011 WL 13175827 (N.D. Ala. Mar. 31, 2011), *aff'd*, 460 F. App'x 819 (11th Cir. 2012). The plaintiffs in that case challenged the defendants' "one for one" incentive program, under which dealers could order certain 2007 model trucks only if they also ordered the same number of 2008 model trucks. *Id.* at *10. The plaintiffs argued that the defendants coerced them into buying trucks they did not want. In granting summary judgment for the defendants, the district court held, "[s]ince Plaintiffs remained free at all times to choose not to participate in the program and, instead, order other models, their coercion claim fails." *Id.* at *11. As the court explained, "as long as an entity uses tactics that a party is free to reject, even the AMVFA's liberal definition of 'good

---

[4]     Notably, Plaintiff does not cite a single case supporting any of its arguments that Defendants' conduct was coercive.

faith' does not prohibit persuasive conduct."[5] *Id.* at *10. The court further noted that the defendants "observed reasonable commercial standards because they implemented the program" for legitimate business reasons. *Id.* at *11.

Here, like the dealers in *Long-Lewis Sterling*, Plaintiff remained free to choose not to participate in Defendants' exclusive facility incentive programs and, instead, sell vehicles from its dual-branded facility. And like the distributors in *Long-Lewis Sterling*, Defendants implemented the challenged incentive programs for legitimate business reasons. These similarities bolster the conclusion that Defendants' voluntary incentive programs were not and are not coercive. *See id.*

Plaintiff has failed to establish a genuine dispute that Defendants were dishonest in fact or failed to observe reasonable commercial standards of fair dealing in the trade, as required to maintain its claims under Alabama Code §§ 8-20-4(1)(f) and (g). Furthermore, Defendants have established an absence of genuine dispute that their incentive programs constitute persuasion and as such are beyond the scope of the AMVFA's prohibitions. Accordingly, summary judgment is due to be **GRANTED** on Counts 1–4, 9, and 10.

---

[5]    On appeal, the Eleventh Circuit noted that the statutory definition of coercion now in place had not been enacted in 2006 when the incentive program there at issue was created. *Long-Lewis Sterling*, 460 F. App'x at 820. Thus, in affirming the district court's ruling that the defendant's incentive program was not coercive, the appellate court did not apply the statutory definition from § 8-20-3(1) and relied instead on the ordinary meaning of "coerce." *Id.* Moreover, this Court acknowledges that unpublished opinions from the Eleventh Circuit are not binding precedent. District Judge Kallon's interpretation of the statutory definition nevertheless remains instructive.

**B. A reasonable jury could find Defendants' denial of Plaintiff's variance request arbitrary, unconscionable, unreasonable, or not in good faith (Counts 5, 6, and 11).**

Alabama Code § 8-20-4(2) makes it unlawful for any distributor "to engage in any action with respect to a franchise which is arbitrary, unconscionable, unreasonable, or is not in good faith and which causes damage to any of the parties." *Id.* Good faith means "[h]onesty in fact and the observation of reasonable commercial standards of fair dealing in the trade." *Id.* § 8-20-3(8). The AMVFA does not define arbitrary, unconscionable, or unreasonable. For the purpose of this Motion, the Court adopts Plaintiff's definitions of those words, supplied by *Black's Law Dictionary* and tacitly accepted by Defendants. As provided, "arbitrary" means "depending on individual discretion" or "founded on prejudice or preference rather than on reason or fact"; "unconscionable" means "extremely unfair"; and "unreasonable" means "irrational or capricious." *See Black's Law Dictionary* 119, 1663, 1679 (9th ed. 2009).

Defendants assert that their decision to include exclusivity components in their incentive programs cannot be arbitrary, unconscionable, unreasonable, or in bad faith because it was based on their good-faith judgment that exclusive facilities serve important business interests. For example, Defendants believe that exclusive facilities improve brand awareness and provide a better customer experience. (Doc. 26 at 24.) Plaintiff concedes this point and argues instead that the issue is the way in

which the programs were applied to it. (Doc. 30 at 29.) Specifically, Defendants'
decision to deny Plaintiff's variance request after it made substantial investments at
Defendants' request and helped establish the Genesis brand was arbitrary,
unconscionable, unreasonable, and not in good faith. Plaintiff claims lost incentive
monies and diminished pricing power relative to other dealers as damages.

In 2014, Plaintiff began construction of a new Hyundai dealership. (Doc. 30
at 4.) About halfway through construction, HMA asked Plaintiff to modify its design
to incorporate a premium Genesis alcove called a "Showroom within a Showroom."
(*Id.* at 5–7.) Plaintiff agreed and incorporated the requested modifications despite
the substantial additional cost of doing so. (*Id.* at 13.) By 2016, HMA had announced
a plan to separate Genesis from Hyundai and launch it as a new luxury brand. (*Id.* at
5.) HMA's representative assured Plaintiff that the separation of the Genesis brand
would be "perfect for [Plaintiff] because [Plaintiff's facility would] be the model for
the Hyundai/Genesis store." (*Id.* at 6.) HMA lauded Plaintiff's new facility at a
national dealer meeting in Las Vegas as a showpiece combined Hyundai and Genesis
dealership. (*Id.* at 7.) Several dealers flew to Birmingham to see first-hand Plaintiff's
model for HMA's new global image design.  (*Id.*)

In 2020, Defendants launched the Accelerate and Keystone incentive
programs; they launched the Brand Ambassador Program in 2022. (Doc. 22 ¶¶ 12,
14, 22.) Plaintiff does not receive the facility incentive monies offered under these

programs because its combined Hyundai and Genesis facility—which it built at Defendant's behest—does not satisfy the exclusive facility provisions. (*Id.* ¶¶ 15, 21, 25.) However, the programs provide that Defendants may grant exceptions to the exclusive facility requirements "if appropriate to take into account special circumstances." (Doc. 30-19 at 1.)

In October 2020, Plaintiff requested from GMA an exception to receive payments under the exclusivity provisions of the Keystone program while continuing to operate in its facility "as is or with reasonable modifications." (*Id.* at 2.) On behalf of Plaintiff, HMA and GMA personnel prepared a variance request that stated:

> The purpose of this request is to gain an exclusivity variance for Hyundai and Genesis of Tuscaloosa, owned and operated by Barry Buckner, allowing the dealership to remain cohabitated yet qualify for both Accelerate and Keystone.
>
> Barry Buckner has been a Hyundai dealer since 10/01/1990. In 2016, he invested $12.5M+ to build a state of the art GDSI facility that would incorporate the then approved Genesis Showroom within a Showroom including the Genesis Salon. He built the facility to meet and exceed all HMA and GMA requirements, according to HMA and GMA direction. This was one of the first locations in America that had the Genesis Salon inside.

(Doc. 30-20 at 6.) During a videoconference in February 2021, Defendants informed Plaintiff that the variance request would be denied. (Doc. 30 ¶¶ 38, 39.) Defendants' only explanation for denying the request was, "That was then and this is now." (Doc. 27-3 at 81.) Defendants sent a letter in March 2021 formally rejecting Plaintiff's

variance request; the only explanation given in that letter was, "Exclusivity is an essential element of the [incentive programs] and neither GMA nor HMA is willing to waive compliance with that condition for either of the Dealerships." (Doc. 27-15 at 3.)

The Court agrees with Defendants that, without more, an action supported by legitimate business rationale is not arbitrary or in bad faith.[6] *See, e.g.*, *Love Pontiac, Cadillac, Buick, GMC Truck, Inc. v. Gen. Motors Corp.*, 173 F.3d 851, 1999 WL 125562, at *3 (4th Cir. 1999) (unpublished) ("By definition, an action which is based on a legitimate business rationale is not an arbitrary action.") (interpreting a substantially identical statute). Defendants contend—and Plaintiff does not dispute—that their exclusive facility incentive programs are justified by reasonable business considerations. (Docs. 26 at 24–25; 30 at 29, 32.) Therefore, Plaintiff must show that Defendants acted improperly in some way other than implementing the exclusive facility incentives.

---

[6]     Defendants cite several cases supporting the proposition that a franchisor's actions are not arbitrary or in bad faith if motivated by legitimate business considerations. *See, e.g.*, *Jaguar Land Rover N. Am., LLC v. Manhattan Imported Cars, Inc.*, 738 F. Supp. 2d 640, 653–55 (D. Md. 2010), *aff'd*, 477 F. App'x 84 (4th Cir. 2012); *Love Pontiac, Cadillac, Buick, GMC Truck, Inc. v. Gen. Motors Corp.*, 173 F.3d 851, 1999 WL 125562, at *3 (4th Cir. 1999); *Hickman v. Am. Honda Motor Co.*, 982 F. Supp. 881, 885–86 (N.D. Ga. 1997), *aff'd*, 138 F.3d 958 (11th Cir. 1998); *Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co.*, 976 F.2d 58, 63–64 (1st Cir. 1992). None are binding and none addresses a sufficiently similar issue to the one before this Court. Although this Court is satisfied that an action motivated by business considerations is generally not arbitrary or in bad faith, it declines to hold that such an action could not be unconscionable or unreasonable.

Plaintiff argues that Defendants acted arbitrarily, unconscionably, unreasonably, or not in good faith—not in implementing the exclusive facility incentive programs—but in denying its variance request as to the exclusive facility provisions of Accelerate and Keystone. Defendants present credible justifications for implementing the exclusive facility incentives at issue. (*See* doc. 25 ¶¶ 35–40.) But they provide virtually no explanation for denying Plaintiff's variance request, despite the substantial investments Plaintiff made in the Genesis brand at Defendants' request. Viewing these facts in the light most favorable to Plaintiff, a reasonable jury could conclude that Defendants' denial of Plaintiff's variance request was arbitrary, unconscionable, unreasonable, or not in good faith. *See Simpson v. Wolf Ridge Corp.*, 486 So. 2d 418, 420 (Ala. 1986) ("[R]easonableness is normally a fact question for the jury…."); *see also Ledbetter v. Darwin Dobbs Co.*, 473 So. 2d 197, 201 (Ala. Civ. App. 1985) ("Whether a merchant acts in good faith is generally a jury question."). Summary judgment on Counts 5 and 6 is therefore due to be **DENIED**.

However, there is no evidence that Plaintiff ever requested a variance from the exclusive facility provision of the Brand Ambassador Program. Plaintiff having offered no evidence that Defendants acted improperly in implementing the Brand Ambassador Program, Defendants are entitled to judgment as a matter of law. *Melton*, 841 F.3d at 1219; *see Carroll Kenworth Truck Sales, Inc. v. Kenworth Truck*

*Co., a div. of Paccar*, 781 F.2d 1520, 1526 (11th Cir. 1986) ("Just as the existence of good faith is to be determined by the jury on a case by case basis, the existence of evidence sufficient to create a jury question is to be determined by the court on a case by case basis."); *Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co.*, 976 F.2d 58, 63 (1st Cir. 1992) (interpreting a substantially identical statute and affirming summary judgment where "Plaintiff produced little or nothing to support its contention that defendant's conduct was arbitrary, in bad faith or unconscionable"). Accordingly, summary judgment on Count 11 is due to be **GRANTED**.

### C. There is no unlawful price discrimination (Counts 7, 8, and 12).

Alabama Code § 8-20-4(3)(g) prohibits price discrimination among dealers. It makes it unlawful for any distributor:

> To offer to sell or lease, or to sell or lease, any new motor vehicle to any motor vehicle dealer at a lower actual price therefor than the actual price offered to any other motor vehicle dealer for the same model vehicle similarly equipped or to utilize any device including, but not limited to, sales promotion plans or programs which result in such lesser actual price and which are not offered to dealers of vehicles of the same line make….

*Id.*

There is no dispute that Defendants charge dealers the same invoice price for the same model vehicles similarly equipped. (Docs. 26 ¶ 34; 26-6 ¶¶ 8, 9.) Plaintiff instead relies on experts to argue that Defendants unlawfully sell vehicles to dealers at different net prices due to the effects of the incentive programs. (Doc. 30 at 34.)

Plaintiff's argument implicitly equates "net price" with "actual price" under the statute. (*See id.*) From a purely economic perspective, Plaintiff's argument has some merit. But the incentive programs are "programs which result in such lesser actual price." Ala. Code § 8-20-4(3)(g). As Defendants argue, Plaintiff must therefore establish that the programs are "not offered to dealers of the same line make." *Id.* To hold otherwise would be to impermissibly read everything after "equipped" entirely out of the statute. *See Craft v. McCoy*, 312 So. 3d 32, 37 (Ala. 2020) (explaining that courts must "give effect to the legislature's intent in enacting a statute when that intent is manifested in the wording of the statute," and that "a court may explain the language, but it may not detract from or add to the statute") (quotations omitted); *City of Montgomery v. Town of Pike Rd.*, 35 So. 3d 575, 584 (Ala. 2009) ("There is a presumption that every word, sentence, or provision [of a statute] was intended for some useful purpose, has some force and effect, and that some effect is to be given to each, and also that no superfluous words or provisions were used.") (alteration in original) (quotations omitted); *Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute.") (quotations omitted).

There is no genuine dispute that Defendants offered the same incentive programs on the same terms to all dealers. (Doc. 22 ¶ 26.) Plaintiff argues that it did not receive the same offer as other dealers because, unlike dealers who already had

exclusive facilities, it would have to "discard[] its investment and spend[] another $10 million on an exclusive Genesis facility three years after opening its current facility." (Doc. 30 at 35.)   In other words, Plaintiff argues—without supporting authority—that Defendants' incentive programs were "not offered to dealers of vehicles of the same line make" because each dealer faced distinct costs to earn the incentives.[7] Ala. Code § 8-20-4(3)(g). Because Plaintiff's argument that it was not offered the same opportunity as other dealers to participate in Defendants' incentive programs is unsupported by law or fact, the Court is unpersuaded.

Plaintiff argues in the alternative that, because the offers had acceptance deadlines which have passed, it no longer has the same opportunity to earn the incentive monies that other dealers receive. But the statute does not state that offers to join sales programs must remain open indefinitely; it requires only that sales programs be offered to all dealers. Ala. Code § 8-20-4(3)(g). Here, the programs were offered to all dealers. (Doc. 22 ¶ 26.) That the offers had terms, including deadlines to accept, does not change the undeniable fact that all dealers received the same offer. Moreover, even if this Court held that § 8-20-4(3)(g) prohibits incentive programs having acceptance deadlines that predate the earning of incentive monies,

---

[7]     This Court's independent review revealed no cases analyzing Alabama Code § 8-20-4(3)(g) under such a theory. Likewise, the Court found no cases analyzing similar statutes in Alabama or other states under such a theory. *See generally* Ala. Code § 8-21B-8(e); N.Y. Gen. Bus. Law § 696-b(8); Fla. Stat. Ann. § 686.611(3)(f); Ga. Code Ann. § 10-1-662(a)(12).

Plaintiff's claims would still fail for lack of injury. *See* Ala. Code § 8-20-11 (providing remedies for "any person who is injured in his business or property by a violation of this chapter"); *GPI-AL, Inc. v. Nissan N. Am., Inc.*, No. CV 17-0511-WS-MU, 2019 WL 5269101, at *7–9 (S.D. Ala. Oct. 17, 2019) (granting summary judgment for the defendant on an AMVFA claim where the plaintiff failed to show that it was injured by the challenged conduct) (citing *DaimlerChrysler Motors Corp. v. Susan Schein Chrysler, Plymouth, Dodge, Inc.*, 853 So. 2d 925, 927 (Ala. 2003)). Plaintiff could only be injured by the programs' deadlines if it would construct qualifying exclusive facilities but for those deadlines, and there is no evidence or assertion that Plaintiff would do so. Indeed, Plaintiff spends considerable effort arguing that it would be irrational for it to construct and maintain exclusive facilities. (*See* doc. 30 at 16–18.)

Finally, Defendants argue that no dealer in Alabama qualifies for the exclusive facility incentives under Keystone (Count 7), so there is no relevant "lesser actual price" charged. Citing *Lide v. Parker's Ex'r*, Defendants argue that the AMVFA only applies to dealers in Alabama. 60 Ala. 165, 169 (1877) ("It cannot be presumed that the legislature meant to give to its enactment, if it could do so, an extra-territorial operation[.]"). Because the Court resolves Count 7 on other grounds, it declines to address the extraterritorial effect of § 8-20-4(3)(g).

The Court finds no genuine dispute that Defendants charged all dealers the same actual price for vehicles similarly equipped and that any program used which resulted in a lesser price was offered to all dealers in compliance with § 8-20-4(3)(g). Accordingly, summary judgment as to Counts 7, 8, and 12 is due to be **GRANTED**.

### D. There is no legally cognizable civil conspiracy (Count 13).

Plaintiff's final claim alleges that GMA unlawfully conspired with HMA in its multiple violations of the AMVFA. (Doc. 14 at 9.) Under Alabama's intracorporate-conspiracy doctrine, "a corporation may not be held liable for any alleged conspiracy with its own employees or agents." *M & F Bank v. First Am. Title Ins. Co.*, 144 So. 3d 222, 234 (Ala. 2013) (citing *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1261 (11th Cir. 2010)). This doctrine has been applied to bar claims of conspiracies between a limited liability company and its members, and between a parent company and its wholly owned subsidiary. *See, e.g.*, *S. Field Maint. & Fabrication LLC v. Killough*, 2018 WL 4701782, at *9 (M.D. Ala. Oct. 1, 2018) (dismissing conspiracy action against limited liability company and its sole member); *see also Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984) (holding, in the context of an alleged conspiracy under the Sherman Act, "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise").

Because GMA is a wholly owned subsidiary of HMA, it cannot form a conspiracy with HMA as a matter of law. (Doc. 22 at 44.) Plaintiff cites no cases that apply the intracorporate conspiracy doctrine and allow a conspiracy claim to proceed against a limited liability company and its sole member or a corporation and its wholly owned subsidiary. Accordingly, summary judgment as to Count 13 is due to be **GRANTED**.

### E. Punitive damages are not permitted in this action.

Plaintiff argues that it is entitled to recover punitive damages on its claims. Under Alabama law, "[p]unitive damages may not be awarded in any civil action … other than in a tort action where … the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff." Ala. Code § 6-11-20; *Treadwell Ford, Inc. v. Leek*, 272 Ala. 544, 546 (1961) ("Punitive damages are not recoverable as a matter of right except as provided by statute."); *accord Love v. Delta Air Lines*, 310 F.3d 1347, 1358 (11th Cir. 2002) ("[W]here a statute expressly provides a remedy, courts must be especially reluctant to provide additional remedies.") (quotations omitted).

The AMVFA does not provide for punitive damages. *See* Ala. Code § 8-20-11 (providing for recovery of "the damages sustained by [the plaintiff] together with the costs of the suit, including a reasonable attorney's fee"). Plaintiff does not assert

any tort causes of action. Thus, Plaintiff is not entitled to punitive damages. Summary judgment against Plaintiff's punitive damages claims is **GRANTED**.

### IV.   CONCLUSION

Defendants' Motion for Summary Judgment is due to be **GRANTED** in part and **DENIED** in part. Plaintiff's Motion to Strike (doc. 31) and Motion to Supplement Response (doc. 39) are hereby rendered **MOOT**. The Court will enter an Order consistent with this Opinion.

**DONE** and **ORDERED** on September 27, 2023.

L. Scott Coogler
United States District Judge

215647